ALBANY,
August, 1808.

Bailey and Bogert *against* Ogden and Ogden.

Bailey &
Bogert
v.
Ogdens.

THIS was an action of *assumpsit.* The declaration stated a special agreement, that the plaintiffs, on the 14th of *December*, 1804, being possessed of a quantity of sugars, did, at the instance and request of *Francis Huguet*, the broker of the defendants, sell to them, and they by their broker bought, 184 boxes of white sugars, at 16 dollars and 25 cents per 100 weight, and also 205 boxes and 1 hogshead of brown sugars, at 12 dollars and 50 cents per 100 weight, upon the following terms and conditions : That the same were to be paid for in two equal payments, the one half at 60, and the other half at 90 days, for which promissory notes, with indorsers, were to be given, and the debentures for the sugars received by the plaintiffs in part payment ; that the sugars were to remain in the store of the plaintiffs for the defendants, who were to pay two shillings per box, per month, for storage, until removed. There was an *averment* of the delivery

An entry made by the vendor of goods, in his book of sales, of the name of the purchaser, and the terms of the contract of sale, which was read to the agent of the vendee, who made the purchase, and assented to by him as correct, was held not to be a sufficient memorandum in writing, within the statute of frauds, it not being signed by the party to be charged, or by his agent.

Whether the vendor is bound by such a memorandum, so that the vendee could enforce the contract against him ? *quere.*

The form of the memorandum of the bargain is not material, but it must state the contract with reasonable certainty, so that the substance of it can be understood from the writing itself, without having recourse to *parol* proof.

An actual delivery of goods, or of a part of them, is not always required by the statute of frauds, but à virtual or constructive delivery may be sufficient. Those circumstances which ought to be held tantamount to an actual delivery, ought, however, to be so strong and unequivocal, as to leave no doubt of the intent of the parties. An agreement with the vendor about the storage of the goods, and the delivery by him of the export entry to the agent of the vendee, were held not to be sufficiently certain to amount to a constructive delivery, or to afford an *indicium* of ownership.

Where the vendor of goods on a credit, required notes of the vendee with approved indorsers, which was agreed to by the agent of the vendee, as one of the terms of the contract of sale, *it seems*, that the contract of sale is not complete, until the principal, or vendee himself, has assented to the giving of indorsed notes, and the indorsers have been named and approved.

Whether an agent, who is authorised to purchase goods at a certain price, upon a certain credit, can stipulate, so as to bind his principal, to give indorsed notes or security ? *quere.*

An agent or broker, authorised to purchase goods on certain terms, is a competent witness, in a suit between the vendor and the vendee, though he has exceeded his authority.

of the sugars, and a demand of the notes; and a breach alleged, that the same were not given, nor the money paid, &c. The cause was tried at the sittings, in *New-York*, before Mr. Justice *Tompkins*, and a special jury of merchants.

At the trial, the deposition of *Walter Willis*, a witness, was read, who deposed, that he had lived as a clerk with the plaintiffs, since *December*, 1799; that at several times prior to the 13th of *December*, 1804, *Huguet*, who acted as a broker for the defendants, called at the store of the plaintiffs, to look at some sugar, with a view to purchase it for the defendants; that on the 13th or 14th of *December*, 1804, (and he rather thought it was the 13th) *Huguet* called again, and after some conversation with the plaintiffs, finally and absolutely purchased 160 boxes of white, and 190 boxes of brown sugar, which had been imported from the *Havanna*, in the schooner *Mary-Ann*, and arrived in *New-York* the 6th of *November*, 1804; and also 14 boxes and 1 hogshead of brown sugar, and 24 boxes of white sugar, which had been imported in the sloop *Caroline*, on the 29th of *October*, 1804; that the prices and terms were agreed on; that he agreed to give the defendants' notes indorsed at 60 and 90 days, but that the debentures on the sugars were to be received in part payment; that *Huguet* requested that the sugars might remain in the store, and that he would pay storage for them; and it was agreed that the sugars should remain, and that the storage should commence after the expiration of the current month. The price of storage was fixed at 2 shillings per box; the month's storage for the sugars imported in the *Mary-Ann*, ended on the 8th of *January*, and for those imported in the *Caroline*, on the 30th of *December*.

An entry of the sale, and the terms, was made by one of the plaintiffs, in a *memorandum book*, and the entry read to *Huguet*, who said it was correct. *Huguet* then requested the plaintiffs to give him a minute of the *import entries*, to enable the defendants to make an export entry

of the sugars, in order to obtain the drawback ; and one of the plaintiffs gave to *Huguet* such a minute. The memorandum book, together with the other books of the plaintiffs, and the sugars and store, were destroyed by fire, on the 18th of *December*, 1804. Two or three days after the fire, the witness, on being requested by the plaintiffs, made a memorandum relative to the sale, to the best of his recollection. He further stated, that it was a general practice with the plaintiffs, not to give bills of parcels for goods sold, until they were delivered, or until they received the money or notes for which they were sold ; that *Huguet*, in the character of broker, had, before the above sale, purchased goods from the plaintiffs for the defendants ; that the plaintiffs required *indorsed notes*, because the sum was large, and they were acting as factors for others, and the sugars were sold by them as agents or factors for foreign correspondents ; that *Huguet* wanted the plaintiffs to take the notes without an indorser, but they refused.

The *book-keeper* of the plaintiffs, and another clerk, testified to the same facts.

The three witnesses said, that no mention was made, in any of the conversations between *Huguet* and the plaintiffs, whether the defendants were to be at liberty to remove the sugars, before the delivery of the notes ; nor was there any conversation as to the person who was to be the indorser of them ; nor whether the sugars were sold according to the import weight or not.

Several merchants, who were called as witnesses, testified, that it is a common practice, in dealing with respectable merchants, to deliver the goods, before calling for the notes, whether they are to be indorsed or not, without previously inquiring who is to be the indorser ; that it is not usual to stipulate for storage until the bargain is complete, and they never heard of an instance of the minute of the import entry of goods being delivered, until after the goods were sold.

The plaintiffs, pursuant to a written notice, called on the defendants to produce two letters written by one of the defendants, the one dated the 11th of *December*, 1804, at *Philadelphia*, and directed to *Andrew B. Lyde*, in *New-York*, his clerk, and the other from the same to the same, dated the 13th of *December*, and also the minute of the import entry delivered, which were produced ; and the deposition of the said *Lyde* was read, who stated, that for four years past he had lived with the defendants, as a clerk ; that in *November*, 1804, the defendant *R. Ogden* left *New-York* for *Europe*, and on the 2d of *December*, 1804, the defendant *J. Ogden* left *New-York* for *Philadelphia*, having been previously, as the defendant *J. Ogden* said, in treaty with the plaintiffs, for the purchase of sugars ; that he heard the defendant *J. Ogden* authorise *Huguet* to purchase the sugars at a limited price, at 12 dollars and 50 cents for the brown, and 16 dollars and 25 cents for the white sugars, on a credit of 60 and 90 days ; that neither the deponent nor any other person had any discretionary authority from *J. Ogden* on the subject ; that on the 12th of *December*, he received from *J. Ogden* a letter, in which, he said, " in respect to the sugars of *Bailey & Bogert* I think it is probable they will come to our price, say 12 dollars and 25 cents, and 16 dollars and 25 cents, at 60 and 90 days ;" and on the 13th of *December*, he received another letter from *J. Ogden*, in which he said, " *Huguet* may now buy the sugars of *Bailey & Bogert*, if he can, on the terms they offered, say 12 dollars and 50 cents, and 16 dollars and 25 cents, at 60 and 90 days credit ;" that on the same day he shewed the last letter to *Huguet*, and authorised him to make the purchase of the plaintiffs, on the terms therein specified ; that on the same day *Huguet* told him that the plaintiffs had agreed to let him have the sugars on the above terms, but demanded *indorsed* notes ; that this condition occasioned some surprise to the deponent, and he told *Huguet* he had no authority to say that the defendants would give an indorser ; that the deponent told *Huguet* that the defendant *J.*

*Ogden* would be in town in a day or two, and call on the plaintiffs; that all further negotiation was considered as at an end till his return, and he heard nothing further on the subject, until after the fire; that when the deponent shut up the counting house of the defendants, on the evening of the 17th of *December*, *J. Ogden* had not yet returned from *Philadelphia*, nor did he hear of his arrival until the morning after the fire; that on the 20th of *March*, 1805, one of the plaintiffs called on *J. Ogden* for payment of the sugars, who denied the purchase; that the defendants have never, to his knowledge, been asked for, or given an indorser; that *Huguet* was usually employed by *J. Ogden*, in purchasing sugars and other goods, and had made frequent purchases for him before the above transaction; that it was the general practice for the defendants to give instructions to *Huguet* with respect to such purchases, and for *Huguet* to report, before the bargain was concluded.

*Francis Huguet*, who was sworn as a witness on the part of the defendants, said, that on the 14th of *December*, 1804, a clerk of the defendants requested him to buy the sugars on the terms mentioned in their letter; that he went to the plaintiffs, who offered them on those terms, with an approved indorser; that he replied that he did not believe that the defendants would object to satisfy them as to the indorser, *but that was not his order*, and that *J. Ogden* would be in town on *Monday;* that he wrote with his pencil in his memorandum book, as follows:

" 14th *December*,
" *J. Ogden & Co.*———*Bailey & Bogert*,
" Brown 12 1-2 ⎱
" White 16 1-4 ⎰ 60 and 90 days.
" Debenture part pay."

That the plaintiffs said they would not consent to sell the sugars, without an indorser; that on the next day, the plaintiffs read to him the memorandum which they had made the day before, thus:

" 14th *December*,

" Sold *Huguet* for *J. Ogden & Co.* notes with approved indorser,          boxes white,          do. brown *Havanna* sugars, at 12 1-2 for brown, and 16 1-4 for white, payable at 60 and 90 days ; debenture we will receive in part payment."

That he said to them it was right, *but in respect to the indorser, he said, that J. Ogden will be in town on Monday, and you will fix it with him ;* that he went and told the clerk of the defendants that the plaintiffs demanded an indorser, who replied that he had no order about that, and it must be left to *J. Ogden,* on his return; that he saw *J. Ogden* the morning after the fire, who refused to give an indorser ; that he made no memorandum or entry of it in his day-book, until he knew whether *J. Ogden* would accept of the terms, but merely kept the memorandum with a pencil in his memorandum book : that he made no agreement about storage, nor said any thing about removing the sugars ; that he did not consider the bargain concluded, if *J. Ogden* did not agree to give an indorser.

The defendants further proved the delivery to them by the plaintiffs, on the 25th of *December,* 1804, of a bill of parcels of the sugars; and that the latter on the 29th of *December* demanded notes, without an indorser.

The judge charged the jury, that if *Huguet* acted under the authority of the defendant's letter of the 13th of *December,* he was clothed with discretionary powers, as to the security to be given, and the defendants were bound by his stipulation to give an approved indorser, provided such stipulation was made by him ; that his authority by virtue of that letter extended to an acceptance of the delivery of the goods ; that a note or memorandum, to satisfy the statute of frauds, must contain the names of the parties, and the terms of the contract, and that if the names of the parties be inserted at the top, in the middle, or at the bottom, by their authority, it is sufficient ; that here being but one special count upon the contract, and

that count averring a delivery, the averment must be proved, even if there had been a note or memorandum within the statute; that the right to recover depended on the fact, whether there was a consummated bargain, and a delivery and acceptance of the goods, so as to change the property: that the delivery and acceptance need not be actual, but may arise by construction from the acts and declarations of the parties; and it was submitted to the jury, whether the declarations and acts of the parties amounted to a waiver by the plaintiffs, of the weighing of the goods, and a delivery of the notes, as precedent to the transfer, and an acceptance of the goods by *Huguet*, as the property of the defendants; if they did, that they ought to find for the plaintiffs, but, otherwise, for the defendants.

The jury found a verdict for the defendants, and a motion was made, at a former term, to set it aside, and for a new trial.

*C. I. Bogert*, for the plaintiffs. 1. The first question is, whether *Huguet*, the broker, was authorised to make the bargain which he concluded with the plaintiffs. A special agent must, no doubt, act within the scope of his authority; and the point of inquiry is, what was the extent and scope of the authority of the agent in this case. Where a person is authorised to do a certain thing, he is clothed with all the powers, relative to the object of his agency, that may be necessary to attain it. If an agent is directed to purchase a particular piece of land, he cannot buy another piece; but if he obtain the piece he was sent to purchase, the principal will be bound for the price. If he be limited as to the price, and he exceed it, yet his principal will be answerable for the excess of price, if the particular instructions of the agent were not made known to the vendor, who has nothing to do with the terms prescribed by the principal.* A master or principal will be bound by the special warranty of his servant or agent, in relation to goods sold.† Where a broker subscribed a policy in the name of another, proof that he had frequently done so before, was held sufficient evi-

ALBANY,
August, 1803.

Bailey &
Bogert
v.
Ogdens.

* *Fenn* v. *Harrison*, 3 Term Rep. 757. 4 Term Rep. 177. 1 *Pothier on Obligations*, by *Evans*, p. 45. P. 1. ch. 1. sec. 1. art. 5. § 4.
† 1 Str. 653.
‡ Salk. 289.

ALBANY,
August, 1808.

Bailey &
Bogert
v.
Ogdens.

* *Neal* v. *Erving*, 1 *Esp. Ca.* 61. See 1 *Esp. Ca.* 111. 3 *Esp. Ca.* 64.

dence of his authority, to charge the principal.* *Huguet*, in the present case, was a common broker, and had been frequently employed by the defendants to purchase goods, and had more than once purchased sugar of the plaintiffs, for them. He was, therefore, to be considered as their agent or factor. The letter from the defendants, directed him to make the purchase on the terms which they had offered. Although nothing had been said about indorsed notes, yet, as he was not specially instructed to the contrary, his agreement to give indorsed paper, taking into view also, the general practice on sales of merchandise, was within the scope of his authority. Great inconvenience and embarrassment would result from a contrary doctrine, in all the transactions of commerce, if the agent or broker, employed to make a bargain, were required to communicate the exact terms of his instructions, to the vendor. Where a person is employed as a broker, it is always understood, that he is clothed with competent authority to conclude the purchase ; and whether he observe his particular instructions, or not, is a question solely between him and his employer.

2. Considering, then, *Huguet*, as having sufficient authority to bind the defendants, the next question is, whether the contract of sale made with the plaintiffs was so complete, and valid, as not to be defeated by the statute of frauds. The clerks of the plaintiffs swear that they understood the bargain as finally concluded ; and, indeed, all the circumstances proved, show it to have been so. The things sold and the price were agreed upon. The plaintiffs wish the goods to be removed, and the defendants request that they may remain in store, and agree for the storage, at a certain stipulated rate. The import entry is demanded for the purpose of enabling the defendants to obtain the drawback. These acts would not have taken place, if the contract had not been complete and final. The agreement to let the goods remain in the store of the plaintiffs, and that the defendants should pay for the storage at a certain rate, is as strong a symbolical

delivery of them,* as if a bill of parcels, or a key of the warehouse, had been delivered to the defendants.† A written order for the delivery of goods has been held a sufficient delivery within the statute of frauds.‡ So, where a bargain was struck for the sale of a stack of hay, by the parties on the spot, and the vendee sold a part of it to a third person who took it away, but without the consent of the vendor, this was left to the jury, as sufficient evidence of a delivery, so as to take the case out of the statute of frauds.§ Putting a mark upon goods has been considered as tantamount to an actual delivery or possession, so as to divest the vendor's right to stop *in transitu.*¶ But it may be said that the sale was not complete, because, as the defendants were to give approved indorsed notes, it might be that the plaintiff would not approve of the indorsers; and if they did not approve of the indorsers, they might stop the goods *in transitu.* The right of stopping *in transitu,* grows out of, but does not affect the contract of sale, and, indeed, is not applicable to a case like the present, or where there is an *actual* delivery of the goods.

As to a note or memorandum in writing : The names of the parties, and the terms of the contract, were reduced to writing by the plaintiffs, and read to *Huguet,* who assented to them. *Huguet,* himself, also made a memorandum in his note book, of the contract. It is not necessary that both parties should sign :** and writing is equivalent to signing.

In the case of *Saunderson* v. *Jackson,*†† a bill of parcels given by the vendor, for goods, pursuant to an order, and a subsequent letter of the vendor referring to the order, taken together, were held a sufficient memorandum in writing within the statute.

3. Again, *Huguet,* without a release from the defendants was an incompetent witness, for if he exceeded his authority, he would be answerable to them; he was,

ALBANY,
August, 1808.

Bailey &
Bogert
v.
Ogdens.

* See *Cowper,* 294. 1 *Gaines,* 46. 1 *East,* 94.
† *Hunn* v. *Bowne,* 2 *Caines,* 38. *Hollingworth* v. *Napier,* 3 *Gaines,* 182. *Lansing* v. *Turner,* 2 *Johns.* 16.
‡ *Searle* v. *Keeves,* 2 *Esp. Ca.* 598.
§ *Chaplin* v. *Rogers,* 1 *East,* 192.
¶ *Ellis* v. *Hunt,* 4 *Term Rep.* 464.

** See *Roget* v. *Clapp,* 2 *Caines,* 117.
†† 2 *Bos. & Puller,* 238.

ALBANY,
August, 1808.

Bailey &
Bogert
v.
Ogdens.

*. 2 *Bos. &
Puller*, 238.

† 2 *Esp. Ca.*
298. 1 *East*,
192.
‡ 6 *East*, 614.

therefore, interested to show that he acted according to his instructions.

4. Another ground on which the verdict ought to be set aside, is the misdirection of the judge. Though the special count in the declaration averred a delivery, yet if there was a memorandum in writing, that would be sufficient under the statute. Both things, a delivery and a note in writing, need not be shown. The written papers connected with the other facts, ought to have been left to the jury as evidence of a delivery,* but the judge positively directed them on this point, as a question of law, and not for their decision. Again, the judge stated to the jury, that the weighing of the goods, and the delivery of the notes were necessarily precedent to the delivery or transfer of the property, unless expressly waived by the defendants. But unless the weighing of the goods forms a part of the bargain or contract of sale, the contract is consummate without it.†

In the case of *Hanson* v. *Meyer,*‡ there was a written order to the warehouse-man, " to *weigh* and *deliver* the goods," and by the particular terms of the contract, the weighing was an act precedent to the delivery.(*a*)

(*a*) It seems to be a general rule in contracts of sale, where no time of credit is given to the vendee, that the payment of the price or consideration must precede the delivery, (2 *Black. Comm.* 447. 1 *Salk.* 113. 6 *East*, 625.) Where there is a sale, therefore, of goods, by *number, weight*, or *measure*, at so much a piece, a pound, or bushel, it is necessary that the things should be counted, weighed, or measured, before the *price*, or consideration to be paid, can be ascertained. Before this is done, the *contract* of sale, it is true, is considered as existing, so as to give the vendee a right of action for the delivery of the thing, on tendering the price, and the vendor his action against the vendee for the price, on offering to deliver the thing sold. But before the goods are weighed or measured, or the articles counted, the sale is not so consummate and perfect, as absolutely to change the property, but the goods still remain *at the risk of the vendor*. (See *Pothier, Traité du Contrat de Vente,* part 4. no. 308.) And this appears to be the doctrine, as laid down by Lord *Ellenborough,* in the case of *Hanson* v. *Meyer,* (6 *East*, 625.)

Where the sale is expressed to be at so much a pound, or bushel, it is considered a sale by the weight or measure ; and the weighing,

*Hoffman* and *T. A. Emmet,* contra. If there was any misdirection of the judge in this cause, it was in favour of the plaintiffs, for he charged the jury, that if they were satisfied that there was a delivery of the goods, to find a verdict for the plaintiffs. He did no more than state the law on the subject, leaving the facts to the decision of the jury, unembarrassed with any legal questions. The declaration in this case, is on a contract of sale, and all material averments must be proved. These averments are,

1. The contract of sale.
2. That notes with indorsers were to be given.
3. The delivery of the goods.
4. The weight.

By notes with indorsers, must be understood, such indorsers as the plaintiff should *approve.* The defendants could not compel the plaintiffs to accept notes indorsed by any persons they might think proper to request to write their names on the back of the notes. The stipulation, if intended to have any force, meant that they should be *approved* indorsers. If the defendants had brought their action against the plaintiffs, on the contract for the non-delivery of the sugar, it would have been necessary for them to have averred, that they had given notes with approved indorsers, or had tendered such as ought to be approved. The giving of notes, then, with indorsers, was a condition precedent to the delivery. Until that was done, the defendants could have no right to demand a delivery of the goods. To support the special count in the declaration, it should be shown, that there was an absolute delivery of the sugars, that the entire dominion over them was transferred, and that the vendor had parted with the possession. Suppose the defendants had become

or measuring, is necessary before the sum to be paid can be ascertained; but where the sale is of a certain thing said to contain so much for a single and entire sum, it is a sale by the whole, or lump, ( *per aversionem,*) the contract of sale is perfect, and the thing sold remains at the risk of the purchaser. (*Pothier, ibid.*)

ALBANY,
August, 1808.

Bailey &
Bogert
v.
Ogdens.

bankrupts, could their assignees have taken the sugar? Or had they died, would the sugar have been assets in the hands of their administrators? There is no pretence that there was an actual delivery. The witnesses merely state, that the bargain was complete. Has there been a virtual or constructive delivery? There is no instance of a virtual delivery, in which the dominion over the property has not been transferred to the vendee. As in the case of a delivery of the key of a warehouse, and other instances of a constructive delivery, where effectual means are given to the vendee to obtain the use and command of the subject.*

* 2 Johns. 56.

While the goods are in the actual and absolute possession of the vendor, and the price or consideration has not been paid, there cannot be said to be any transfer of the goods to the vendee, so as to give him a right to take and dispose of them.

In the cases which have been cited, the possession of the goods was in the warehouse-man, the auctioneer, or the wharfinger.

† 1 East, 192.

‡ 1 Bos. &
Puller, N. S.
69.

The case of *Chaplin* v. *Rogers*,† and that of *Hammond* v. *Anderson*,‡ were decided on the ground, that a part of the goods had been actually delivered. The delivery of the minute of the *import entry* to the agent of the defendants, cannot amount to a virtual or constructive delivery, for it gave to the defendants no power or dominion over the sugar. Before the export entry could be completed, so as to entitle the defendants to receive the debentures, it was necessary for the plaintiffs, or the importers of the goods, to take an oath, and to conform to the other formalities required by the law of the *United States*.§ A delivery, therefore, of the minute of the import entry amounted to nothing.

§ Vol. 1. p. 397.
sect. 76.

Again, there was no bill of parcels delivered, no *earnest* given, no part-payment of the price, no mark of the defendants put upon the goods, no delivery of a part of the goods, nor a key of the warehouse, no muniments which could enable the defendants to claim and take pos-

session of the goods, nor any *indicia* of property, which could amount to a virtual or symbolical delivery. The act of virtual or constructive delivery must be clear, explicit, and unequivocal, and with the avowed intent to transfer the possession of the goods. Nothing has been proved but a contract of sale, *in presenti.* Such a contract, even before the statute, at common law, unless *earnest* was given to bind the bargain, would require a simultaneous payment or delivery to fix the contract, and transfer the property. If no payment or tender of the price is made, the vendor is at liberty to dispose of the goods as he pleases.* So that, according to the evidence in the case, the plaintiffs might have refused to deliver the goods, until the price was paid, or the notes with approved indorsers were received, and have sold them to a third person. How, then, can it be said, that the property was so transferred or delivered, as to be at the risk of the vendee?

> * *Roberts, on the Statute of Frauds,* 165, 166.

That the plaintiffs urged the defendants to take the sugar away, proves no more than that they were ready to deliver it, as soon as they received the notes. The agreement about storage could not amount to a virtual delivery, for nothing was to be paid until the expiration of the month. But *Huguet* had no power to agree that the goods should remain with the plaintiffs, or to pay a certain price for storage. If he had not, then that fact furnishes no evidence of a transfer of property. There should have been a receipt given by the plaintiffs for the goods, or a bill of parcels; for had the defendants brought their action for a delivery of the goods, they would have had no document or muniment by which to prove their right of property. There ought to be a reciprocity in this case. If the defendants could not assert their right to the delivery of the sugar, neither ought the plaintiffs to be allowed to maintain their claim for the price.

Again, where goods are sold at so much per pound, and it is necessary that they should be *weighed,* to ascertain the price or consideration to be paid, there the

ALBANY,
August, 1808.

Bailey &
Bogert
v.
Ogdens.

* *Hanson* v.
*Meyer*, 6 *Term Rep.* 615—625.
† 2 *Johns.* 13.

weight must precede the delivery ; and unless this preliminary act of weighing was expressly waived, there would not be such a delivery as to vest the property in the defendants.*

In the case of *Lansing* v. *Strafford*,† there was a bill of parcels delivered by the vendor with a receipt in full for the price, which the court considered as a complete transfer of the property, so that the thing remained in the store of the vendor at the risk of the vendee.

Then, was there a note or memorandum in writing, of the bargain within the statute of frauds ?(a)

The language of the statute is clear and explicit, that the note or memorandum must be signed by the parties to be charged. Not one of the authorities cited, applies to the present case. Where the memorandum is signed by one party only, it must be the party who is to be charged. The only memorandum here was an entry by the plaintiffs in their books, and that did not express the *weight* of the goods. Admit this to be a signing by the plaintiffs, and that the agent of the defendants assented to it, will it be said that if one party has signed the memorandum, the bare *assent* of the party to be charged, shall be equivalent to a signing? This would be to repeal the statute, and open at once the floodgates of fraud and perjury, which it was intended to close. If this court had the power, would they be inclined to defeat what has been always held to be a most wise and beneficial statute ?

The memorandum made by the agent of the defendants, in pencil, does not identify the articles, nor specify the

(a) The 15th section declares, " that no contract for the sale of any goods, &c. for the price of 10*l.* or upwards, shall be good, except the buyer shall accept part of the goods so sold, and actually receive the same, or give something in earnest to bind the bargain, or in part payment, or that some note or memorandum in writing of the bargain be made and *signed by the parties to be charged by the contract, or their agents, thereunto lawfully authorised.*" (Laws of *New-York*, v. 1. p. 75—80.) The 15th section corresponds with the 17th section of the *English* statute.

weight, and is too imperfect and unintelligible, to be regarded as a writing within the meaning of the statute.

Again, as to the authority of *Huguet.* He was not a general agent. He could make no purchase for the defendants without an express order for the purpose ; he could conclude no bargain without their approbation. His being a broker, by profession, did not constitute him a general agent of the defendants, with indefinite powers. It is admitted, that every special agent must act within the scope of his authority. The letter of the defendants authorised *Huguet* to accede to the terms of sale offered by the plaintiffs, and to try to get a credit of 90 days. He had no power to give a greater price than the one mentioned, or to agree for a less term of credit. If he had power to go further, and to stipulate for security, or indorsed notes, no limit can be assigned to his authority. He might pledge the *real estate* of the defendants as security.

In the case of *Patty* v. *Carswell*,* it was held, that a special authority must be strictly pursued, and that where a person was authorised to sign the name of another to a note payable in six months, he had no power to put his name to a note payable in two months. A *fortiori* an authority to stipulate for a note at 60 days, cannot authorise an agreement to give an *indorsed* note.

Mr. Justice *Ashhurst*, in the case of *Fenn* v. *Harrison*, said, there was a wide distinction between a general and a special agent ; and that an agent acting under a limited power, cannot bind his principal by an act in which he exceeds his authority. And in the case of the *East-India Company* v. *Henley*,† Lord *Kenyon* took the distinction between a general and a special agent, and held that in the latter case, the principal was bound only when the agent acted within his authority.

In the case of *Runquist* v. *Ditchell*,‡ the broker who advertised the ship, acted with the knowledge of the captain who was the general agent, and Lord *Kenyon* laid great stress on the *publicity* of the thing, as a circumstance to show the privity and knowledge of the owner.

ALBANY,
August, 1808.

Bailey &
Bogert
v.
Ogdens.

* 2 *Johns.* 48.

† 1 *Esp. Ca. N. P.* 111.

‡ 3 *Esp. Ca.* 64. *Abbott,* 93. *S. C.*

Bailey &
Bogert
v.
Ogdens.

\* 2 *Str.* 647.
*Salk.* 289. 1
*Str.* 506. 3
*Wilson*, 40. 2
*H. Black.* 590.
7 *Term Rep.*
480.

† 3 *Term*, 35,
36.

That *Huguet* was not authorised to stipulate for in-dorsed notes, is confirmed by the evidence that the defendants were not in the habit of giving indorsed paper.

*Huguet*, as a broker or agent, was a competent witness from necessity.\* And if he exceeded his authority he would be liable to both parties. To make a witness incompetent, it must be shown, on his *voir dire*, or his interest must be otherwise proved. If it was proved that *Huguet* exceeded his authority, then the plaintiffs could not recover. Again, a witness competent to answer *any* question, cannot be rejected generally ;† and he was competent to answer the question as to the authority.

*Pendleton*, in reply. 1. The bargain or contract between the parties, was definite and complete. Four witnesses, on the part of the plaintiff, prove the bargain to have been concluded, and their evidence is confirmed by the acts and declarations of *Huguet*, as well as by the internal evidence, arising from the letters of the plaintiff; the delivery of the import entry, and the agreement that the goods should remain on storage. But it is said, that the bargain was suspended until Mr. *Ogden* should consent to give indorsed notes, and it is objected that *Huguet* had no authority to give an indorser, and that if he had, no indorser was named or agreed on, and that the goods were not *weighed*.

It is said that the authority of *Huguet* is special, depending on the letter from the defendants, but the letter, if the whole of it be taken together, seems to contain a general authority to purchase the sugars, leaving the terms to the judgment of the agent ; so that whatever he might stipulate relative to the purchase, would be binding on the principal.

A broker, from the nature of his employment, is considered as the agent of both parties. His powers must be construed according to the nature of the object of his employment. If he contracts for an object of commerce, he has authority to do what is usual in commerce, in re-

lation to such object. His authority may be distinguished from his particular instructions. Where there are no express instructions to the contrary, his authority is unlimited. If he exceeds his instructions, he will be liable to his principal; but under his authority, arising from the nature of his employment, his acts, in relation to a third person, will be binding on his principal, unless an express prohibition to do the act be shown.

Agents may be distinguished into three kinds; such as have a special authority in relation to a special subject; such as have a general power in relation to a special subject; such as have a general power in relation to all objects. In the case of *Fenn* v. *Harison*,[*] on the third trial, where it appeared that the principal did not say that he would not indorse the bill, the court were unanimously of opinion, that the agent acting within the general scope of his authority, which was to get a bill discounted, but without any particular instructions, might bind his principal by an indorsement. This is perfectly consistent with the opinion of the majority of the court in the same case, in 3 *Term Rep.* 757. In the case of *Ringuist* v. *Ditchell*,[†] where a broker, who was employed to advertise a ship, inserted a clause in the advertisement, that she was warranted to sail with convoy, though a question was made whether the broker was authorised or not to make the warranty, yet Lord *Kenyon* said, that whether he had done this without authority, was a matter between him and his principal; the public had nothing to do with it, and the principal must be answerable for the acts of the agent, though he exceeded his authority. So in the case of *Hicks* v. *Hankin*,[†] though it was held that a special agent, acting with special instructions, could not bind his principal, if he went beyond his instructions, yet if he had any discretion to go beyond the price limited, his authority became general, and his principal would be bound, though he exceeded the limits of his instructions. In the present case, *Huguet* was a broker by profession, and had

ALBANY,
August, 1808.

Bailey &
Bogert
v.
Ogdens.

[*] 4 *Term Rep.*
177. S. C. 3
*Term Rep.* 757.

[†] 3 *Esp. Cas.*
*N. P.* 64. See
S. C. *Abbott*, 92.

[‡] 4 *Esp. Cas. N.*
*P.* 114.

been frequently employed by the defendants to make pur-
chases, and though the price was mentioned at which the
purchase was to be made, yet the matter was clearly left
to his discretion.   Nothing was said about *indorsed* notes.
He was, therefore, unrestrained in that respect.   The
letter of the defendant did not say any thing about notes,
but only that *Huguet* was to obtain a credit at 60 or 90
days.   As well might it be objected that he had no authority
to stipulate that the defendants should give their notes.
Whether the indorsers were named or not, the bargain was
not the less complete and binding.

So as to the weight; if the sugar was purchased at so much
per pound, there was a sufficient certainty.   The weighing is
an incidental thing, and does not affect the contract.   As the
sugar was to be exported, it was requisite, by the act of con-
gress, that it should be weighed at the custom-house scales,
previous to its being shipped for exportation.   And it
appears, from the evidence in the case, that where goods
are purchased for exportation, it is the practice to pay for
them according to the export weight.   The case of *Han-*
*6 East, 615.* *son* v. *Meyer\** does not apply to the present case.   There
the vendor directed his agent "to weigh and deliver his
goods;" the weighing, therefore, was a preliminary act.
*7 East, 558.* In the case of *Hinde* v. *Whitehouse*,† the goods were not
weighed, as they had been previously weighed at the
king's scales ; and in the several cases which have been
cited of the sale of goods by the pound, no objection was
ever raised that the contract was not complete, until the
goods were actually weighed.

2. Was this a valid contract within the statute of frauds ?
The 15th section of the statute, which relates to the sale
of goods, is different in its language from the 11th sec-
tion, and takes a middle course between the inconvenience
of requiring every contract to be reduced to writing, and
the danger of allowing parol contracts.   A contract for
the sale of goods under this section, will be valid, if the
buyer accepts and receives part of the goods sold, or
gives something *in earnest* to bind the bargain, or in

*part payment ;* or if some *note* or *memorandum* of the bargain be made and signed by the parties, to be charged with the contract. The act does not say that the *contract* or *agreement* must be in writing, but only that there must be some note or memorandum of the *bargain*. The *English* statute, from which our own is copied, has, in regard to the 4th and 17th sections, corresponding with the 11th and 15th sections of our act, received the construction for which we now contend. The case of *Wain* v. *Walters** arose on the 4th section of the *English* statute ; and the court, considering the force of the word *agreement*, decided that the whole contract must be in writing ; that is the consideration for the promise as well as the promise itself ; but in *Egerton* v. *Matthews*,† which came under the 17th section, the court were of opinion that it was enough, if there was some note or memorandum of the *bargain* in writing. The memorandum intended, is for the purpose of refreshing the memory, and preventing any mistake as to the terms of the contract. From the numerous decisions in the courts, both of law and equity, in *England*,‡ it appears to have been settled, as to the sale of goods, that if there be a note or memorandum in writing sufficient to enable the parties to make out the contract, it is a compliance with the statute. A mere sale note, a letter, or order in writing, has been held a sufficient memorandum to take the case out of the statute. The memorandum in the present case was explicit, containing the names of the parties, the thing sold, and the price and mode of payment.

3. That there was a *virtual* delivery of the goods, is evident from the various authorities which have been cited. It is objected that there was no corporal tradition of the sugars, or the delivery of any muniment. The agreement as to the storage was tantamount, for the plaintiffs, afterwards, must be considered as the agents of the defendants. In the case of *Hinde* v. *Whitehouse and Galen*,§ the goods were not delivered to the vendee, nor were they in a situation to be delivered, yet the con-

ALBANY,
August, 1808.

Bailey &
Bogert
v.
Ogdens.

\* *5 East*, 10.

† *6 East*, 307.

‡ *1 Black. Rep.* 599. *1 Atkyns*, 503. *2 Bos. & Pull.* 328. *9 Vesey*, jun. 244. 357. *1 Esp. Cas.* 105. 2. *Esp. Cas.* 598. *4 Esp. Cas.*114. *5 Viner*, 127. *2 Ventris*, 361. *3 Bro.* C. C. 149.

§ *7 East*, 558.

Bailey &
Bogert
v.
Ogdens.

* 1 *Salk.* 113.
6 *Mod.* 162.
*Noy's Maxims,*
88.

tract was held valid, and samples having been delivered, it was considered as a compliance with the statute. In most cases of a sale of goods, the vendor is the agent of the vendee, until an actual delivery, and has the physical power over the goods, though the property is transferred to the vendee. Where *earnest* is given, the vendor is not bound to deliver the goods until the whole money is paid.*

KENT, Ch. J. delivered the opinion of the court. This cause depends upon the decision of these two general questions :

1. Was there a note or memorandum in writing, binding upon the defendants, within the meaning of the statute of frauds ? If not, then,

2. Was there a delivery of the sugars, so as to change the property, and throw the risk of the subsequent loss upon the defendants?

1st. The only *memoranda* which were made relative to the transaction, were, an entry of the sale of the sugars, made by one of the plaintiffs in their memorandum book, immediately after the alleged sale, and the minute made with the pencil of *Huguet,* in his pocket memorandum book. The entry of the plaintiffs, made and retained by them, was not binding upon the defendants, because the statute requires the note or memorandum to be signed by the party *to be charged.* The numerous cases admitting an agreement to be valid within the statute, if signed by one party only, are all of them cases in which the agreement was signed by the party against whom the performance was sought. Some of the cases arose under the 4th, and others under the 17th section of the *English* statute, but the words are, in this respect, similar, and require the same construction. (2 *Cha. Ca.* 164. 1 *Powell on Contracts,* 286. 5 *Viner,* 527. pl. 17. 1 *Vezey,* 82. 3 *Bro. C. C.* 162. 3 *Atk.* 503. 6 *East,* 307. 7 *Vesey,* jun. 265. 9 *Vesey,* jun. 234. 351. 1 *Esp. Cas.* 190. *Ballow* v. *Walker,* in this court, *Jan.* Term, 1802. 2 *Caines,* 120.) It has, however, been said, that there would be a want of

mutuality, if the plaintiffs in this case were bound by their entry, and the defendants should not be. The same difficulty has occurred in other cases, and Lord *Redesdale* felt it so strongly, that he observed, (*Lawrenson* v. *Butler*, 1 *Schoales and Lefroy*, 20.) that to enforce every agreement signed by one party only, against such party, would be to make the statute really a statute of frauds, and that there was no late case in which one party only was bound by the agreement, where equity had decreed performance, though he admitted the import of the statute to be, that no agreement should be in force, but when signed by the party to be charged. He further intimated, that as no man signed an agreement but under a supposition that the other party was bound, as well as himself, if the other party was not bound, he signed it under a mistake, which might be a ground for relief in equity. Whether the plaintiffs, in the present case, were bound at law by their memorandum, or if bound, whether they might have relief in equity, are questions not before us, and concerning which we are not now to inquire. It is sufficient to say, that the defendants were not bound by any note or memorandum in writing of the contract, unless the same was signed by them, or their authorised agent. *Huguet* was in this instance their agent to make the purchase, and any memorandum made by him respecting the purchase, would operate as a memorandum made by the defendants. But the memorandum which he made, was too vague and indefinite to be a compliance with the statute. The form of the memorandum cannot be material, but it must state the contract with reasonable certainty, so that the substance of it can be made to appear, and be understood from the writing itself, without having recourse to parol proof. This is the meaning and substance of the statute, and without which, the beneficial ends of it would be entirely defeated. (*Prec. in Cha.* 560. 3 *Atk.* 503. 1 *Vesey*, jun. 333.) The memorandum of *Huguet* is absolutely unintelligible. It has not the essentials of the contract, or memorandum of a contract. No person can as-

certain from it which of the parties was seller, and which was buyer, nor whether there was any actual sale between them, nor what specific article was the object of the sale, or in what quantity, or what was the price. A memorandum much more intelligible than this, and defective only in one essential point, capable of full explanation by a witness, was lately rejected by the court of *C. B.* in *England*, on the same ground. (*Champion* v. *Plummer*, 1 *Bos. & Pul. New Rep.* 252.)

There was, then, no note or *memorandum* in writing which took the present contract out of the statute of frauds, as far, at least, as it respected the defendants.

2d. The next question then is, whether here was a delivery of the goods, or of any part, so as to take the case out of the statute. The words of it are, that "the buyer must accept part of the goods sold, and *actually receive the same.*" But, notwithstanding this strong language of the statute, it has become a settled construction, that actual delivery, in the popular sense of the words, is not, in all cases, requisite, but a virtual delivery will, in some instances, be equally effectual. A delivery may be presumed or inferred from circumstances, and the doctrine on this subject was correctly laid down in this case, in the charge given by the judge to the jury. (2 *Esp. Cas.* 598. *Roberts on Frauds,* 174. to 183. 1 *East,* 192. 2 *Caines,* 44. 2 *Johnson,* 16.) Whether here was a delivery and acceptance, was a fact properly submitted to the jury, and assuming the competency of *Huguet* as a witness, the jury were well authorised to draw their conclusions in favour of the defendants. An objection was made to him on the ground of interest, but I think the objection was properly overruled. If he exceeded his powers, he stood indifferent between the parties, as he would, at all events, be liable to the losing party, whichsoever it might be, for the injury done by such excess ; and if he did not exceed his power, he was liable to neither. (7 *Term,* 480.) According to *Huguet's* testimony, the bargain and sale was never consummated, for not only the person who was to

be the indorser, but whether the defendants would or would not give an indorser or surety for the payment, were circumstances attending the contract, left open until the return of one of the defendants from *Philadelphia.* Here was then, in the mean time, the *locus penitentiæ,* and the contract could not be said to be fixed. The witnesses, undoubtedly, differed as to the conversations which passed between the parties, but the jury were the sole judges to whom the greater degree of credibility was due, and it is to be recollected, that it was a special jury of merchants. We are not dissatisfied with their verdict upon this ground. Here was no actual delivery, nor an attempt at any symbolical delivery : There was no specific designation of the goods, by marking them, or otherwise : No delivery of the key of the store in which they were lodged. They were left in the actual possession and dominion of the plaintiffs ; and under the same apparent ownership as before. If the conversations about storage, and taking a minute of the import entries, would, in such cases, amount to an actual delivery, and be deemed a substitute for the note or memorandum in writing, it appears to me, that the statute of frauds would, in a great degree, become useless, and might be set aside as a dead letter. We do not wish to shake any of the cases in which the *actual delivery* required by the statute has been dispensed with, but those cases have gone far enough ; our leaning should be towards the plain meaning of the statute. The circumstances which are to be tantamount to an actual delivery, should be very strong and unequivocal, so as to take away all doubt as to the intent and understanding of the parties. The agreement about storage might have been conditional, and depending upon the final completion of the contract, as to the giving of the notes with a competent indorser ; and the taking of the minute of the import entry, was at least but an equivocal act. It was not an *indicium* of ownership. Any person might have taken the same paper for his own information

or convenience. But if *Huguet* was to be believed, (and his character was well supported, and his testimony corroborated by that of *Lyde*,) there was no delivery or acceptance of the sugars, and the bargain was left incomplete at the time of the loss. The court are of opinion, therefore, that the motion on the part of the plaintiffs for a new trial must be denied.

THOMPSON, J. not having heard the argument in the cause, gave no opinion.

Rule refused.